## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID PRICE,                          :
                                      :
     Plaintiff,                       :
                                      :
  v.                                  :     No. 3:03CV1156(DJS)
                                      :
JOHN ARMSTRONG, ROBERT GILLIS,  :
AND EDWARD BLANCHETTE;                 :
                                      :
     Defendants.                      :

## MEMORANDUM OF DECISION

Plaintiff David Price was an inmate confined to Gates Correctional Institution ("Gates"), where he was serving a ninety-day sentence in the custody of the State of Connecticut Department of Corrections ("DOC").  Price filed this action seeking damages under 42 U.S.C. § 1983 alleging that on April 5, 2000 defendants, who are DOC employees, violated his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution by failing to protect him from assault by another inmate and showing deliberate indifference to his serious medical needs.  Price also alleges that defendants violated his right to due process by transferring him from one housing level to another housing level without a hearing.  Price has sued defendants in both their individual and official capacities, and is seeking compensatory and punitive damages, as well as attorney fees.  Now pending is defendants' motion for summary judgment (dkt. # 16).  For the reasons that follow, defendants' motion is **GRANTED.**

## I. FACTS

On February 14, 2000, Price began serving a ninety-day jail sentence at the Hartford Correctional Institution.  In approximately ten days, he was transferred to the J.B. Gates Correctional Institution ("Gates"), where he sustained serious injury to his eye at the hands of another inmate, Ricky Dennis ("Dennis").  At the time, defendant John Armstrong was the Commissioner of the DOC, defendant Robert Gillis was the Warden of Gates, and defendant Edward Blanchette was the Director of Clinical Services for the DOC.

Upon arrival at Gates, Price lived in the Alpha Dorm and remained there until March 9, 2000 when he was transferred to the Golf Dorm, which was the general housing unit.  Price remained in the Golf Dorm until he was transferred to the Lucretia Shaw Building.  Gates reserved the Lucretia Shaw Building for inmates who had obtained security clearance for off-premises jobs or had obtained level one status.  After ten days in the Lucretia Shaw building, Price was transferred to the Bravado Dormitory ("Dormitory B"), which was a housing unit for inmates without security clearances for off-premises jobs.

Dormitory B housed approximately one hundred inmates in a large room, which was divided into a series of cubicles.  Each cubicle was door-less with walls approximately four feet high, which allowed a standing person to see all the top bunks, but not

-2-

the bottom bunks.  In each cubicle, there were up to four dual
bed bunks.  Under each bunk, there were two drawers so inmates
could store personal property items.  Gates did not provide
inmates with locks, but an inmate could purchase a combination
lock for his drawer at the commissary for approximately four or
five dollars.  In Dormitory B, Price occupied the bottom bunk in
a cubicle on the opposite end from the Correctional Officer's
station.  His cubicle assignment was based solely on space
availability.

At approximately 2:00 p.m. on April 5, 2000, Price purchased
items from the commissary and entered his cubicle.  There were
approximately a dozen people in his cubicle whom Price did not
know.  He unpacked his commissary items and put them in his
drawer. Price then began to write a letter to his daughter, but
got up to either hang up his jacket at the rear of the cubicle or
to check his commissary receipt, which was in his jacket pocket.
(Dkt. # 16 ¶ 20; Dkt. # 25 ¶ 1).  Upon returning to his bunk, one
of the inmates in the cubicle, Dennis, told Price that an apology
was in order for not saying, "excuse me."  See id.  Price then
turned around and asked Dennis if he was talking to him.  See id.
Dennis answered "yes, that he'd appreciate some manners," and
Price then responded by telling him that "he was sorry he felt
that way, but they were in small living quarters which he could
not help."  Id.  Price then went back to his bunk and sat down

-3-

with his back to Dennis. <u>See</u> <u>id.</u>

He resumed writing the letter to his daughter when suddenly he was hit in the right eye with a hard metal object, which was later found to be a lock inside a sock.  He put his hand over his eye and bent back down to his bunk because the pain was excruciating.  His eye then began to bleed.  A Corrections Officer came to Price's cubicle and escorted him to the medical unit.  At the medical unit, Price complained of a headache and dizziness.  The nurse also assessed that Price sustained an approximately one inch long, a quarter inch wide laceration to the center of his forehead; a half inch edema to the right eyebrow; and a one-millimeter puncture of the lateral aspect of the eyeball with moderate bleeding.

After assessing the injury and applying a bandage, the nurse telephoned Dr. Blanchette, who was not present at Gates, and informed him of the assault and the details of Price's condition. Dr. Blanchette was, and still is, the DOC's clinical director and is affiliated with John Dempsey Hospital, which is also known as the University of Connecticut Hospital.  At the time of Price's injury, the general protocol within the DOC was for the nurse to assess a patient to determine the patient's immediate needs and then to call Dr. Blanchette to determine what further action, if any, was required.

Notwithstanding the nurse's request for an ambulance, Dr.

-4-

Blanchette instructed the nurse to transport Price by state vehicle to the University of Connecticut Health Center ("UCHC"). Dr. Blanchette chose to use a state vehicle because it would be faster than waiting for an ambulance, and Price's injuries did not require any medical assistant en route.  Dr. Blanchette also instructed the nurse to have a certified medical assistant provider accompany Price to UCHC.  Finally, he instructed the nurse to notify the UCHC's emergency room triage nurse about Price's condition.

Upon arrival to the UCHC, the staff at UCHC evaluated Price's eye injury through exploratory surgery.  The surgery revealed that the injury consisted of a ruptured globe and puncture wound that went through the anterior and posterior chamber of the eye.  These injuries caused substantial hemorrhaging and instantaneous damage to the eye.  On April 7, 2000, Dr. Ginghold, the eye sub-specialist at UCHC, decided to conduct another exploratory surgery to see if there was any chance of repairing Price's eye.  The second surgery was not successful in saving Price's eye; Price's injury was so severe, that enucleation of the eye was necessary.

Prior to enucleation, Dr. Ginghold explained to Price that in order to prevent total blindness in both eyes it would be medically necessary to remove his injured eye.  Dr. Ginghold gave the plaintiff a couple of days notice, prior to the enucleation

-5-

surgery on April 9, 2000, to permit him to get emotionally prepared for it.

On April 12, 2000 Price was transferred to Osborne Correctional Institution ("Osborne").  Osborne had an infirmary with twenty-four hour nursing care available and a medical health department with psychiatric nursing and social workers.  At Osborne, Price was provided with a variety of pain and anti-depressant medication as well as counseling. Price served the remainder of his sentence in the Osborne infirmary, before he was released from DOC custody.

## II. DISCUSSION

Price alleges four causes of action in his complaint: (1) defendants' failure to protect him from assault by other inmates and deliberate indifference to his medical needs in violation of the Eighth Amendment; (2) defendants' decision to transfer him from the Lucretia Shaw building in violation of the Fourteenth Amendment; (3) defendants' violation of his equal protection rights; and (4) defendants' infliction of emotional distress upon him.  In particular, Price alleges that defendants were deliberately indifferent to his serious medical needs in that (a) there was not a medical doctor on the premises; (b) there was no other healthcare provider on the premises with adequate training to treat Price with the necessary emergent care; (c) he did not get any appropriate emergency medical treatment at Gates; (d) he

lingered at Gates for a lengthy period of time without an
informed diagnosis; (e) the medical personnel at Gates could not
get appropriate, timely instructions from Dr. Blanchette or his
authorized agents, as to how to care for him; (f) he was not
taken to the nearest medical treatment facility for the treatment
of his injuries, but was transported to a more distant facility;
(g) he was left for hours to suffer in excruciating and
unbearable physical pain without any medication, and to suffer
extreme emotional distress; and (h) when he was finally
transported to the University of Connecticut Health Center it was
by a state van with no medical equipment rather than by a faster
and medically equipped ground or air ambulance.

Defendants assert that (1) Price's claims are barred by the
PLRA; (2) the Eleventh Amendment bars Price's claims against them
in their official capacities; (3) Price's claims otherwise lack
merit; and (4) they are entitled to qualified immunity.

### A.   STANDARD

A motion for summary judgment may be granted "if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue of material fact and that the
moving party is entitled to judgment as a matter of law."  Fed.
R. Civ. P. 56(c).  Summary judgment is appropriate if, after
discovery, the nonmoving party "has failed to make a sufficient

showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)). A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

### B. EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants argue that the Prison Litigation Reform Act ("PLRA") bars Price's claims because he failed to exhaust his administrative remedies. The PRLA provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until . . . administrative remedies as are available are

exhausted." 42 U.S.C. § 1997 e(a).  The PLRA's exhaustion requirement, however, applies only to a person confined in any jail, prison, or other correctional facility.  See Id. at § 1997e(h). Litigants who file actions challenging prison conditions after they have been released from confinement are not "prisoners" under 42 U.S.C. § 1997e(a).  See Greig v. Goord, 169 F.3d 165, 167 (2d Cir. 1999).  Therefore, Price did not need to satisfy the PRLA's exhaustion requirement and defendants' motion for summary judgment is denied on this ground.

### C. OFFICIAL CAPACITY

Defendants argue that any claims seeking damages from any defendant in his or her official capacity fail as a matter of law.  Unless the state has waived its sovereign immunity under the Eleventh Amendment, a suit for money damages may not be maintained against the state itself, or against any agency or department of the state.  See Florida Dep't of State v. Treasure Salvors, 458 U.S. 670, 684 (1982).  Section 1983 does not override a state's Eleventh Amendment immunity.  See Quern v. Jordan, 440 U.S. 332, 342 (1979).  Eleventh Amendment immunity also protects state officials sued for damages in their official capacity,  See Kentucky v. Graham, 473 U.S. 159 (1985), because if any recovery would be expended from the public treasury, it would ultimately be a suit against the state.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 n.11 (1984).

-9-

As such, Price may not sue defendants in their official capacity, and defendants' motion for summary judgment is granted on this ground.

### D. DUE PROCESS

Price's claim that defendants' decision to transfer him from the Lucretia Shaw Building to Dormitory B violated due process lacks merit.  A prisoner does not have a due process right to a hearing when prison authorities make a routine placement and classification decision.  The Supreme Court in <u>Meachum v. Fano</u>, 427 U.S. 215 (1976), held that the due process clause does not protect a duly convicted prisoner "against transfer from one institution to another within . . . the prison system," and that prison authorities have discretion to move inmates from one institution to another "for whatever reason or for no reason at all."  <u>Id.</u> at 225.  The Court in <u>Meachum</u> reasoned that

> [t]ransfers . . . are made for a variety of reasons and often involve no more than informed predictions as to what would best serve the institutional security or the safety and welfare of the inmate.  Yet under the approach urged [by the plaintiff], any transfer, for whatever reason, would require a hearing as long as it could be said that the transfer would place the prisoner in substantially more burdensome condition than he had been experiencing. We are unwilling to go so far.

<u>Id.</u>  In <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), the Supreme Court reaffirmed that prisoners do not have a liberty interest in assignment to a particular prison or housing assignment, unless the change imposes "atypical and significant hardship on the

inmate in relation to the ordinary incidents of prison life,"
which may rise to a liberty interest. Id. at 483-84 & 486.

The Supreme Court has also recognized that a prisoner's
transfer may violate due process where state law confers a right
or justifiable expectation that the prisoner will not be
transferred except for misbehavior or upon the occurrence of
another specified event.  See Meachum, 427 U.S. at 226-28.
Connecticut law, however, does not grant prisoners a due process
right to a hearing before a transfer.  See Conn. Gen. Stat. § 18-
86 (2005);  Confone v. Manson, 594 F.2d 934, 938 (2d Cir. 1979)
(holding that Connecticut law provided no basis for inmate's
contention that he had a right or justifiable expectation that he
would not be transferred to an interstate prison absent
misbehavior or some other specified event); Ziemba v. Thomas, 390
F. Supp. 2d 136, 153 (D. Conn. 2005) (noting that Connecticut
prison officials have broad discretion to transfer prisoners);
Tart v. Warden, 46 Conn. Supp. 546, 548 (Conn. super. Ct.
2000)(stating that prisoner petitioner "has no right to a hearing
in Connecticut when being transferred from facility to
facility").  According to Section 18-86 of the Connecticut
General Statutes,  the "commissioner may transfer any inmate of
any of the institutions or facilities of the department to any
other such institution of facility . . . when it appears to the
commissioner that the best interest of the inmate or other

-11-

inmates will be served by such action."  Accordingly, because Price has no liberty interest upon which his due process claim may rest, summary judgment on this claim is granted.[1]

E. DELIBERATE INDIFFERENCE TO SAFETY AND MEDICAL NEEDS

Price claims that, while he was an inmate at Gates, defendants failed to protect him and failed to provide him with medical care.  The Eighth Amendment's prohibition against cruel and unusual punishment governs the rights of sentenced inmates. See Bell v. Wolfish, 441 U.S. 520, 535 & n.16 (1979).  In Farmer v. Brennan, 511 U.S. 825 (1994), the Supreme Court stated, "[t]he Constitution does not mandate 'comfortable prisons,' but neither does it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" Id. at 832.

To evaluate whether there is an Eighth Amendment violation, courts apply the "deliberate indifference" standard.  See id. at 834.  The deliberate indifference standard has both subjective

---

[1] Furthermore, Price's alleges that the termination of his prison job due to his transfer violates his Fourteenth Amendment rights.  Loss of a prison job, however, does not rise to a due process violation because a prisoner does not have a constitutional right to a job.  See Gill v. Moony, 824 F.2d 192 (2d. Cir. 1987) (holding that there is no constitutional right to a job without underlying state law mandating jobs for prisoners); Banks v. Norton, 346 F. Supp. 917, 921 (D. Conn. 1972) (noting that an inmate has no right to a particular job in a correctional institution).

and objective components.  See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  In objective terms, the alleged deprivation must pose a substantial risk of serious harm. See Farmer, 511 U.S. at 835; Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) ("'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain").  The subjective component requires that the official "know[] of and disregard[] an excessive risk to an inmat[e's] health or safety; the official must both be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  Farmer, 511 U.S. at 837.  Nevertheless, a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" if the prison official fails to show that the obvious escaped him. Farmer, 511 U.S. at 842-43.

Therefore, in order to prove deliberate indifference under the Eight Amendment, Price must prove that (1) he was subjected to conditions posing substantial risk of serious harm, (2) that defendants knew that he faced a substantial risk of serious harm, and (3) nevertheless knowingly disregarded that substantial risk by failing to take reasonable measures to abate that harm. See Hayes v. New York City Department of Corrections, 84 F.3d 614,

620 (2d. Cir. 1996).

### 1. Failure to Protect

Price alleges that defendants failed to protect him from Dennis's April 5, 2000 attack.  To prevail on this claim, Price must show (1) that the prison conditions posed a substantial risk of harm; and (2) deliberate indifference.  See Helling v. McKinney, 509 U.S. 25, 35 (1993); Estelle v. Gamble, 429 U.S. 97 (1976).

Viewing the record before the court in a light most favorable to Price, the possession of locks by inmates does not create a substantial risk of serious harm.  See Laube v. Haley, 234 F. Supp. 2d 1227 (D. Al. 2002) (finding that combination locks that can be placed in socks and used as weapons was not sufficiently serious to create a substantial risk of serious harm).  In order for a substantial risk of serious harm to exist, the alleged deprivation must be "sufficiently serious" such that it denies an inmate the "minimal civilized measure of life's necessities." Farmer, 511 U.S. at 834.  Here, although there is evidence to suggest that inmates have used locks to harm other inmates, such as Price, who sustained a gruesome injury, there is no evidence to suggest that this type of assault was pervasive or even common.  The possibility of harm is not equivalent to the substantial risk of harm.  Dr. Blanchette's comment, "a lock and a sock . . . is a rather common weapon utilized in correctional

-14-

facilities," (dkt. # 24 at 9), is not sufficient to meet Price's burden of proof.  For example, Price has not presented the court with data regarding the frequency of assaults in which a lock and sock were used and the percentage of these assaults in which a serious injury occurred.  Therefore, the absence of any statistical, documentary, or narrative evidence showing that this type of assault was frequent or pervasive at Gates forecloses the conclusion that locks pose a substantial risk of harm to inmates.  See Shrader v. White, 761 F.2d 975 (4th Cir. 1985) (noting that the court cannot determine whether weapons manufactured from scraps of metal represented a pervasive risk of harm because the court did not have data on the weapon's propensity and use).  Accordingly, defendants' motion for summary judgment is granted on this ground.

Price also cannot meet his burden of proof regarding his claim that defendants failed to protect him from Dennis.  Price has not produced any evidence indicating that Dennis had a propensity to assault inmates or that Dennis was likely to harm Price for any particular reason.  Price even admits that he did not fear Dennis and that defendants could not have done anything to prevent the attack from occurring.  Accordingly, defendants' motion for summary judgment is granted on this ground.

2. Medical Care

Price alleges that defendants failed to either have available or to provide him with adequate medical care for his eye injury.  As with his failure to protect claim, deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment.  See Estelle, 429 U.S. at 104.  Price, therefore, must demonstrate that the acts or omissions of defendants were sufficiently harmful to evidence deliberate indifference to a serious medical need.   See id. at 106. Negligence alone will not support a section 1983 claim; "to succeed in showing deliberate indifference, [Price] must show that the acts of defendants involve more than lack of due care, but rather involve obduracy and wantonness in placing his health in danger." LaBounty v. Coughlin, 137 F.3d 68, 72 (2d Cir. 1998). The defendants' conduct must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)).  The defendants will be liable under the Eighth Amendment only if their conduct is held to be "repugnant to the conscience of mankind." Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (quoting Estelle, 429 U.S. at 105-06).  Inmates do not have a constitutional right to the treatment of their choice.  See Dean v. Coughlin, 804 F.2d 207,

-16-

215 (2d Cir. 1986).  Thus, mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment.  <u>See</u> <u>Ross v. Kelly</u>, 784 F. Supp. 35, 44 (W.D.N.Y. 1992).

As explained herein, there are both objective and subjective components to deliberate indifference.  <u>See</u> <u>Foote v. Hathaway</u>, 513 U.S. 1154 (1995); <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994). The alleged deprivation must be "sufficiently serious" in objective terms.  <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991).  Defendants do not dispute that Price had a serious medical need.  Thus, for purposes of deciding this summary judgment motion, the court presumes that Price's condition satisfies the requirement of a serious medical need.  As for the subjective prong, the charged prison official must have acted with "a sufficiently culpable state of mind."  <u>Hathaway</u>, 37 F.3d at 66.

### i. Dr. Blanchette

Dr. Blanchette provided health treatment to Price's injured eye, and Price alleges that Dr. Blanchette was deliberately indifferent to his medical needs.  The medical records reveal that after Price's assault a Correctional Officer came to Price's cell and escorted him to the medical unit.  Once in the medical unit, the nurse examined Price and made an assessment.  The nurse then contacted Dr. Blanchette by telephone and described the

nature of the assault, Price's physical condition, and the extent
of his injuries.  Based on this information, Dr. Blanchette had
Price transported to the University of Connecticut Health Center
("UCHC") by a DOC vehicle. Dr. Blanchette then asked the nurse to
call the emergency room at UCHC and inform them about Price's
condition and arrival.  When Price arrived at UCHC he was seen by
Dr. Ginghold, an eye sub-specialist who operated on him in an
effort to save his eye.  During this surgery, it was discovered
that the damage to Price's eye was instantaneous.

Dr. Blanchette was not deliberately indifferent to Price's
medical need.  He reviewed Price's condition and ordered him
transported to UCHC. The fact that Dr. Blanchette was not on the
premises and available only by phone does not constitute
deliberate indifference because he was able to arrange for
treatment and make an assessment.  A nurse on the premises also
helped Dr. Blanchette make an evaluation and get Price to
treatment at UCHC.  To prove deliberate indifference, Price must
demonstrate that not having a doctor in the premises "shocks the
conscience" or constitutes a "barbarous act," and Price has
failed to make this showing.[2]  Accordingly, defendants' motion
for summary judgment is granted as to the claim against Dr.

---

[2] Finally, the evidence does not support plaintiff's
allegation that he was denied mental health care while at Osborne
C.I.  The evidence demonstrates that he was provided with this
care and was given medication to cope with the loss of his eye.
More importantly, Dr. Blanchette did not administer this care.

Blanchette.

### ii. Gillis and Armstrong

Defendants Gillis and Armstrong cannot be held liable because they were not personally involved in Price's care at any time and cannot be liable merely because of their position in the DOC chain of command.  See Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985).  An official cannot be held liable merely under the respondeat superior doctrine.  Colon v. Coughlin, 58 F.3d 865, 874 (2d. Cir. 1995).  Supervisory officials, such as Gillis and Armstrong may be personally involved within the meaning of § 1983 only when their conduct is tantamount to actual participation in the alleged deprivation. See Williams v. Smith, 781 F.2d 319, 323-24 (2d. Cir. 1986).  Price, therefore, must allege a tangible connection between the acts of defendants and the injuries he suffered. See Bass v. Jackson, 790 F.2d 260, 263 (2d. Cir. 1986).  Price, however, fails to allege that Gillis or Armstrong participated or assisted in any of the acts described in the complaint.  Therefore, defendants' motion for summary judgment is granted as to the claims against defendants Gillis and Armstrong.

### F. OTHER CLAIMS

### i. Equal Protection

Price claims that defendants violated his equal protection rights.  Price, however,  has failed to brief his claim to the

court, the court, therefore, grants the defendants' summary judgment motion on this claim for reasons set forth in defendants' memorandum.

### ii. Emotional Distress

Because judgment shall enter in favor of defendants on Price's federal claims, Price's only remaining claim is that defendants inflicted emotional distress upon him.  "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."  Castellano v. Board of Trustees of the Police Officers' Variable Supplements Fund, 937 F.2d 752, 758 (2d Cir. 1991) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)).  "If it appears that the federal claims . . . could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances."  Kavit v. A.L. Stamm & Co., 491 F.2d 1176, 1180 (2d Cir. 1974).  For these reasons, Price's state law claim is dismissed without prejudice.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (dkt. # 16) is **GRANTED**.  Judgment shall enter in favor of each defendant on each of plaintiff's claims, except that plaintiff's state law claim, infliction of emotional distress, is **DISMISSED without prejudice**.  The Clerk of the Court shall close

this file.

So ordered this 11th day of April, 2006.

**/s/DJS**

_____

**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**